1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAHA SAKO, | CASE NO. 14CV1034-GPC(JMA) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| WELLS FARGO BANK. N.A., | [Dkt. No. 25.] |
| Defendant. | |

Before the Court is Defendant's motion for summary judgment. (Dkt. No. 25.) Plaintiff filed an opposition on July 10, 2015. (Dkt. No. 32). A reply was filed on July 17, 2015. (Dkt. No. 33.) A hearing was held on July 31, 2015. (Dkt. No. 38.) Alvin Gomez, Esq. appeared on behalf of Plaintiff, and Beth Kearney, Esq. appeared on behalf of Defendant. After a review of the briefs, supporting documentation and the applicable law, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment.

## Background

On November 26, 2013, Plaintiff Maha Sako ("Plaintiff" or "Sako") filed a complaint against her former employer Defendant Wells Fargo Bank, N.A. ("Defendant" or "Wells Fargo") in San Diego Superior Court, which was removed to this Court on April 24, 2014. (Dkt. No. 1.)  Plaintiff alleges she was terminated in

[14CV1034-GPC(JMA)]

violation of public policy, and due to race and gender discrimination.  Defendant contends that Plaintiff was terminated after an investigation revealed that she issued fraudulent mortgage preapproval letters to customers which were in violation of Wells Fargo's Code of Ethics and Business Conduct, and Risk Management Accountability policy.   The complaint alleges causes of action for wrongful termination of employment in violation of public policy; race and gender discrimination in violation of the Fair Employment and Housing Act; intentional infliction of emotional distress; violation of California Labor Code section 201 (unpaid wages); violation of California Labor Code section 203 (waiting time penalties); and violation of California Business and Professions Code section 17200.  (Dkt. No. 1-1, Compl.)

### Factual Background

Maha Sako is a female of Iraqi descent.  (Dkt. No. 32-2, Sako Decl. ¶ 4.)  She became employed with Great American Bank in November 1984 which was acquired by Wells Fargo in 1986.  (Id. ¶ 6.)  She worked with Wells Fargo in different job titles from 1986 through the date of her termination on March 20, 2013.  (Id. ¶ 7.)  On the date of termination, she was a Home Mortgage Consultant ("HMC") at the La Mesa branch.  (Id.)  She was a HMC for the last seven years of her employment.  (Dkt. No. 25-2, Kading Decl., Ex. A, Sako Depo. at 67:1-13.)  As an HMC, Plaintiff's duties involved selling residential mortgage products, including helping potential borrowers obtain pre-approval for residential loans.  (Id. at 67:14-16; 86:16-24.)  Steven Sawyer ("Sawyer"), the Branch Manager, was her immediate supervisor, and Giovanni Joanna Busalacchi ("Busalacchi"), the Area Sales Manager, was the immediate supervisor of Sawyer.  (Dkt. No. 32-1, Sako Decl. ¶ 12; Dkt. No. 25-4, Sawyer Decl. ¶ 2.)

On November 18, 2011, in a *My News*[1] email, Wells Fargo communicated to its HMCs that the system-generated *Priority*Buyer letter ("PBL") was the "only pre-approval letter acceptable for use at Wells Fargo."  (Dkt. No. 25-5, Miller Decl. ¶ 5;

---

[1]*My News* bulletin is a way that Wells Fargo communicates policy changes to its employees.  (Dkt. No. 25-5, Miller Decl. ¶ 5.)  The *My News* bulletins are distributed by email and/or posted to the *My News* page on Wells Fargo's intranet site.  (Id.)

[14CV1034-GPC(JMA)]

Ex. I.)  For a PBL, the HMC has to enter information on a customer's loan application into an electronic decision engine that generates a loan number and  completes a credit check and determines if the customer is *Priority*Buyer eligible, and if so, generate a PBL with specific information regarding the customer and his/her financial needs. (Dkt. No. 25-3, Kilian Decl. ¶ 8; Ex. C.)  If not eligible, the HMC was required to submit the application to underwriting before mortgage preapproval could be issued to the customer.  (Id. ¶ 9.)

In a declaration, Sako states she never received or read this *My News* bulletin. (Dkt. No. 32-1, Sako Decl. ¶ 44.)  She states that she was never told about the exclusive use of the PBLs until the end of July 2012.  (Id.)

According to Defendant, the use of the PBL letter policy was reinforced verbally and in writing.  Branch Manager Sawyer testified that he reminded his team about the policy several time by email, including one dated July 10, 2012, (Dkt. No. 25-2, Kading Decl., Ex. B, Sawyer Depo.[2] at 48:1-11), and at meetings prior to July 17, 2012. (Id. at 18:24-19:18; 22:10-23:6.)  The July 10, 2012 email stated, "Last but not least is non-compliant pre-qual or pre-approval letters and I know we have covered that several times.  There is no sorry I won't do it again excuse so don't jeopardize your job for something so simple to do correctly." (Dkt. No. 25-2, Kading Decl., Ex. B, Sawyer Depo., Ex. 12 at 176.[3])

Despite the policy, Geraldine Copeland, a Loan Processor, discovered a preapproval letter dated May 15, 2012 signed by Plaintiff that was not a system-generated PBL.  (Dkt. No. 25-2, Kading Decl., Ex. E, Copeland Depo. at 8:17-20; 11:23-25; 12:4-10; 25:3-21; Ex. 1.)  Copeland reported this to Sawyer in July 2012.

---

[2]In Defendant's objections to Plaintiff's evidence, Defendant asserts Plaintiff submitted the uncorrected pages of Sawyer's deposition transcript. (Dkt. No. 34 at 51-52.)  Defendant provides the corrected pages of the uncorrected portions of Sawyer's deposition transcript as Exhibit H to the Supplemental Declaration of Theresa Kading. (Dkt. No. 33-2, Kading Decl., Ex. H.)  However, page 48 of the Sawyer deposition is not listed as an uncorrected page.  (See Dkt. No. 34 at 52.)

[3]The page number is based on the CM/ECF pagination.

[14CV1034-GPC(JMA)]

(Dkt. No. 33-2, Suppl. Kading Decl., Ex. H, Sawyer Depo. at 12:4-25), who in turn reported it, by email on August 30, 2012, to his supervisor Basalacchi, Employee Relations Consultant Julie Miller, and HR Advisor Megan Neville.  (Dkt. No. 25-2, Kading Decl., Ex. E, Copeland Depo. at 11:23-25; 21:18-21; 27:10-13; Ex. B, Sawyer Depo. at 13:5-18; 15:4-16:2; Dkt. No. 25-5, Miller Decl. ¶ 3; Ex. G.)  Basalacchi then reported the letter to Human Resources for investigation.  (Dkt. No. 25-2, Kading Decl., Ex. C, Basalacchi Depo. at 34:6-19; 36:18-37:12.)  On August 31, 2012, Human Resources then referred the matter to Fraud Risk Management who, on the same day assigned it to Corporate Security for investigation.  (Dkt. No. 25-5, Miller Decl. ¶¶ 3, 4, 6.)  Corporate Security is responsible for investigating potential violations of Wells Fargo's Code of Ethics and Business Conduct, and Risk Management Accountability policy.  (Dkt. No. 25-2, Kilian Decl. ¶ 2.)

It was not until February 21, 2013 that Corporate Investigator Yvonne Kilian advised that she had just received Plaintiff's case due to inadvertence that Sako's claim was not in the database.  (Dkt. No. 25-5, Miller Decl. ¶ 7.)  Kilian was assigned to conduct an investigation concerning Plaintiff's use of an unauthorized pre-approval letter that allegedly approved a customer for a mortgage.  (Dkt. No. 25-3, Kilian Decl. ¶ 3.)  During the investigation, Kilian located five additional mortgage preapproval letters dated May 1, May 16, May 18, May 22, and July 17, 2012.  (Id. ¶ 10; Ex. D.)

On February 28, 2013, Kilian interviewed Plaintiff by telephone, and Gary Moreno, another Corporate Security Investigator, listened in on the conversation.  (Id. ¶ 13.)  Based on the telephone interview, Kilian states that Plaintiff acknowledged that she knew for the past year and a half, in order to obtain mortgage preapproval, the requirement was to use the PBLs or to submit documents to underwriting for review and approval.  (Id.)  She also stated that before that time, she believed she was allowed to use a template mortgage preapproval letter as long as she verified income and credit.  (Id.)  She stated she stopped using the pre-approval letters a year and a half ago when management prohibited its use.  (Id.)  During the interview, Kilian emailed Plaintiff the

[14CV1034-GPC(JMA)]

six unauthorized mortgage preapproval letters for her review. (Id.) She stated that she stopped using the letters when Sawyer told her to stop which she thought was more than a year before. (Id.) She also admitted that at times, if she verified all income, assets and ran credit, she would qualify the customer based on her years of experience on a mortgage preapproval letter without a loan application in the system. (Id.) Plaintiff explained that she did this because she knew the PBL system would not generate an approval for certain loans and submitting documents to underwriting for approval would take two to three weeks. (Id.) At the end of the interview, Kilian told Plaintiff to send her an email if she wanted to provide any additional information for Kilian or Employee Relations to consider. (Id. ¶ 14.)

On the same day, Plaintiff emailed Kilian and wrote that she was told not to use the letter "for a while for more like 1yr + months and I could have the time frame wrong but I know I stopped using it after we had a branch meeting with Steve [S]awyer and all the HMC and we were told that the letter was not approved and can't be used and if was used in the past to stop that process and I did . . . ." (Dkt. No. 25-3, Kilian Decl., Ex. F at 40-41.) Plaintiff disputes the meaning of her use of the word, "a year ago" and explains that when she used the word a year ago, she meant the prior year. (Dkt. No. 32-1, Sako Decl. ¶ 54.)

Kilian documented the contents of the interview in an investigation summary emailed on February 28, 2013 to Miller, the Employee Relations Consultant. (Dkt. No. 25-3, Kilian Decl., Ex. D.) According to the interview summary by Kilian, Plaintiff stated that prior to the PBLs, there was a preapproval letter that could be issued as long as income and credit were verified. (Dkt. No. 25-3, Kilian Decl., Ex. D at 27.) When Plaintiff was asked why she continued to use the letter after she was aware of the policy, she stated everyone was using the letters and once the manager stated that the letters could not be issued under any circumstance, she stopped using the letters. (Id.)

The investigation summary included additional unauthorized letters, dated May 1, 2012, May 18, 2012, May 22, 2012 and May 16, 2012 and July 17, 2012, discovered

during her investigation.  (Dkt. No. 25-3, Kilian Decl. ¶ 18; Ex. D.)   She also forwarded the email Kilian received from Plaintiff on February 28, 2013. (Id. ¶ 18; Ex. F.)

Once Kilian submitted her findings with Miller, she was no longer involved in Plaintiff's employment and was not involved in the decision to terminate her.  (Dkt. No. 25-3, Kilian Decl. ¶ 18.)  Kilian had never met Plaintiff and had no knowledge of her race or any of the complaints she made during her employment.  (Id. ¶ 19.)

After receiving Kilian's report, Miller drafted a fact-finding report.  (Dkt. No. 25-5, Miller Decl. ¶ 9; Ex. L.)   The fact-finding report found that despite being informed of Wells Fargo's policy regarding PBLs as of November 2011, Plaintiff had sent six unauthorized mortgage pre-approval letters without even entering a loan application into the system at the time she issued the letters, and at times without running a credit report. (Dkt. No. 25-2, Miller Decl. ¶ 10.)  Plaintiff had not offered any exculpatory reason for her actions when Kilian interviewed her.  (Id.)  To the contrary, she admitted that she knew in 2011 that the use of the letters violated policy. (Id.)  She also admitted she knew the PBL system would not generate an approval for certain loans, and because underwriting was backed up, she would make her own determination to qualify a buyer and issue a pre approval letter based on her own experience.  (Id.)  Plaintiff admitted she did not have underwriting authority to do this. (Id.)  Miller concluded that Plaintiff had used unauthorized pre approval letters and had failed to comply with the PBL requirements.  (Id.)

In addition, all six of Plaintiff's unauthorized pre-approval letters contained the statement that the customer was preapproved for a loan from Wells Fargo in a certain amount. (Id. ¶ 11.)  Such a statement was false because Plaintiff had not even entered a loan application into the system before sending these letters.  (Id.)  Consequently, Wells Fargo had not approved the loan amount under any of its established procedures before Plaintiff sent these letters.  (Id.)  By making the false statement that Wells Fargo had preapproved a customer for a loan when Wells Fargo had never made that

determination, Plaintiff committed an act of dishonesty against the bank.  (Id.)

Miller further concluded that Plaintiff's actions put the bank at risk for issuing letters which essentially constituted a promise to lend and borrowers would rely on this letter as a commitment to lend.  (Id. ¶ 12.)  Wells Fargo could face liability for false commitments to lend.  (Id.)  Furthermore, any loss resulting from Plaintiff's conduct would not be covered by insurance.  (Id. ¶ 14.)

Miller concluded that Plaintiff's actions of issuing unauthorized preapproval letters violated Wells Fargo's Code of Ethics and Business Conduct, and Risk Management Accountability policy.  (Dkt. No. 25-5, Miller Decl. ¶ 13; Dkt. No. 25-2, Miller Decl., Ex. L at 155.)  According to Miller, Plaintiff did not act in an honest, ethical, and legal manner, did not act to protect Wells Fargo's reputation, did not provide accurate information to customers, made false statements to customers, acted outside her authority and created risk for Wells Fargo.  (Id.)

Based on her conclusion, Miller recommended that Plaintiff's employment be terminated.  (Dkt. No. 25-5,  Miller Decl. ¶ 15.)  Her recommendation was presented to the Business Conduct Review Committee, a committee created for the purpose of ensuring consistency in corrective action decisions.  (Id.)  At the end of her presentation, the Business Conduct Review Committee voted to proceed with the recommendation of termination.  (Id.)  Then, pursuant to standard practice, when the Business Conduct Review Committee votes to proceed with termination, the decision is presented to the divisional manager for the Team Member's division to ensure that the manager supports the decision and has no other concerns.  (Id. ¶ 16.)  Miller presented the termination recommendation to Drew Collins, Senior Vice President, Retail Division Sales Manager, and he accepted and authorized the termination of Plaintiff's employment.  (Id.; Dkt. No. 25-6, Collins Decl. ¶ 3.)  At the time, Collins had never met or spoken to Plaintiff, and had no knowledge that she had ever raised complaints of any kind during her employment with Wells Fargo.  (Dkt. No. 25-6, Collins Decl. ¶ 4.)  He also stated that he has authorized the termination of HMCs, for

1    issuing unauthorized preapproval letters in violation of Wells Fargo's Code of Ethics
2    and Business Conduct, and Risk Management Accountability policy.  (Id. ¶ 5.)  The
3    final step was to advise Sawyer how to proceed with termination.  (Dkt. No. 25-5,
4    Miller Decl. ¶ 16; Ex. G.)

5        At the time Miller drafted her fact-finding report, she had never met or spoken
6    to Plaintiff and had no knowledge about Plaintiff's race or knowledge that she
7    complained about anything during her employment. (Dkt. No. 25-5, Miller Decl. ¶ 17.)
8    Miller states she has recommended termination of employment for use of unauthorized
9    preapproval letters by numerous other Team Members who were male and female,
10   Caucasian and non-Caucasian, including individuals not of Iraqi descent.  (Id. ¶ 18.)
11   She does not recall a case where a member made false statements in a preapproval
12   letter and she did not recommend termination of employment.  (Id.)

13       According to Sako, no employee at Wells Fargo in San Diego had been
14   terminated for use of a preapproval letter.  (Id. ¶ 13.)  But she also testified that she was
15   not aware of any other Wells Fargo team members who sent pre-approval letters after
16   they were told they could only use the PBLs.  (Dkt. No. 33-1, Kading Decl., Ex. A,
17   Sako Depo. at 260:23-261:2.)

18       Between 2003 and 2006, Sako worked in the Wells Fargo Wealth Management
19   "WFWM") Division where she suffered repeated sexual advances and inappropriate
20   conduct by senior members of management within the WFWM division.  (Dkt. No. 32-
21   1, Sako Decl. ¶ 16.)  While she reported her concerns of sexual harassment, her
22   manager discouraged her from pursuing her complaints because as a minority and a
23   woman, she should instead learn to "play in the sand box like everyone else."  (Id. ¶
24   17.)  She did not pursue her complaints of sexual harassment, discrimination and
25   hostile work environment due to fear of reprisal.  (Id. ¶ 18.)

26       Between 2010 to the end of 2012, while employed with the Home Mortgage
27   division, Plaintiff asserts she was subject to inappropriate statements and
28   discrimination.  (Id. ¶ 26.)  Her co-employees would refer to her as "Queen of Sheba",

referencing her heritage as well as other references to her heritage that made her feel uncomfortable. (Id.) Co-workers made jokes and inappropriate comments about her middle eastern heritage or being a woman. (Id.) They made jokes saying that because she is Arabic that is why she is sometimes hot-headed. (Id.) Sexual comments were also made. For example, one day, she wore boots and a male co-worker asked, "you know what those boots are called?" He then stated, "They're come fuck me boots." (Id.)

When she worked as a HMC, the Mortgage Division team members did not sexually harass Plaintiff. (Dkt. No. 33-1, Kading Decl., Ex. A , Sako Depo. at 16:12-16.) However, she received negative comments about her gender and race by her team members. (Dkt. No. 32-1, Sako Decl. ¶¶ 27, 29.) The first comment she recalls is that she likes to dress up, that she is spoiled because she is a Middle Eastern woman, and that her husband must spoil her because she is Arabic. (Id.) She also heard comments like "Woman are subservient to their husbands." (Id.) On another occasion, Busalacchi told Plaintiff that "you care too much about your culture." (Id. ¶ 28.) The comments made her feel uncomfortable. (Id.) She "felt treated wrongfully by Joanna and Steve, Cheryl White, Julia the processor and Jerry." (Id.) The negative comments bothered her and affected her ability to do her job, "but I don't allow things affect my work because I need to take care of my customers." (Id. ¶ 29.) Plaintiff did not complain about the negative comments to human resources because she is a minority. (Id.) If one complained too much at Wells Fargo, one gets "managed out." (Id.)

However, she complained to her manager, Sawyer, but he never referred her complaints to human resources and no action was taken. (Id. ¶ 30.) She told Sawyer many times about comments of "here comes Queen of Sheba", "here comes the fashionista" and "[h]ere's Maha again, the hothead. Let's clear all our desks because Maha needs to be top priority." (Dkt. No. 33-1, Kading Decl., Ex. A, Sako Depo. at 29:25-30:23; 34:23-35:5.) She raised the comments to Sawyer every time she met with him. (Id. at 35:6-15.)

[14CV1034-GPC(JMA)]

In 2010, she noticed rampant and unabashed violations of WFHM Division policies that explicitly prohibited the targeting and/or solicitation of potential customers from any of the Wells Fargo proprietary financial programs that were not in the employee's book of business. (Id. ¶ 31.) She noticed that her peers that chose to violate the policy began outperforming and earning more than her. (Id. ¶ 32.) She believed the actions of those who were violating the policy were unethical, unfair, unjust, and possibly illegal. (Id. ¶ 33.) She expressed her concerns to Sawyer and Busalacchi, her supervisors. (Id. ¶ 34.) They acknowledged that they knew her peers were violating the policy, and that it was wrong, but they would not do anything to address it because the production generated by these other HMCs directly impacted their earnings. (Id. ¶¶ 34, 35.)

On January 31, 2012, Plaintiff sent Sawyer an email regarding the volume of sales of another HMC and questioned the fairness, (Dkt. No. 32-1, Sako Decl. ¶ 24), and Sawyer wrote back in an email that "You are fighting within yourself and the winner is always going to be WF.  Control what you can control." (Dkt. No. 25-2, Kading Decl., Ex. 27 at 183.)

Then, on March 12, 2012, she sent an email regarding her complaints of "farming" to Sawyer and Busalacchi. (Dkt. No. 32-1, Sako Decl. ¶ 36; Dkt. No. 25-2, Kading Decl., Ex. 49.)[4]  Sawyer, her supervisor, also complained about this practice. (Dkt. No. 25-4, Sawyer Decl. ¶ 3; Dkt. No. 25-2, Kading Decl., Ex. C, Busalacchi Depo. at 127:19-21.)

Sako was on vacation between July 3, 2012 through July 17, 2012, and did not have email access.  (Id. ¶ 39.) She alleges she did not read the July 10, 2012 email Sawyer sent regarding the use of PBLs since she was on vacation. (Id. ¶ 43.)  Around late July 2012, Sawyer informed her that she and all other HMCs were no longer allowed to send out the pre-approval letters previously created and approved by

---

[4]While Plaintiff also cites to this email as Exhibit 28; however, there is no Exhibit 28 in Plaintiff's exhibits.

[14CV1034-GPC(JMA)]

1    management.  (Id. ¶ 40.)  Before July 2012, she believed she was allowed to use the

2    pre-approval letters.  (Id. ¶ 42.)  After the conversation with Sawyer at the end of July

3    2012, she understood she was required to use the PBLs and stopped using the

4    preapproval letter and only sent out the PBLs.  (Id. ¶¶ 45, 46.)

5        She does not believe she provided anyone with the letters dated May 1, 2012,

6    May 16, 2012, May 18, 2012, May 22, 2012 and July 17, 2012.  (Id. ¶ 56.)  She also

7    states that she is not sure if she provided the client with the first letter dated May 15,

8    2012.  (Id.)  Around March 19, 2013, Plaintiff met with Sawyer and was informed that

9    she was terminated effective March 20, 2013.  (Id. ¶ 57.)  She was shocked because she

10   had never received any verbal or written notice of corrective action.  (Id. ¶ 58.)  Even

11   her supervisor, Sawyer, was surprised that she was being terminated.  (Dkt. No. 32-2,

12   Gomez Decl., Ex. 3, Sawyer Depo. at 30:12-18.[5])

13       During the meeting, Sawyer represented that she would be paid her commissions

14   earned for March 2013 and 30 days thereafter.  (Dkt. No. 32-1, Sako Decl. ¶ 59.)

15   Sawyer testified that he told Sako that she would get her commissions because he

16   thought she would. (Dkt. No. 32-2, Gomez Decl., Ex. C, Sawyer Depo. at 97:4-8; 98:2-

17   6.[6])  Based on his experience with employees being terminated for lack of production,

18   they had gotten commissions.  (Id. at 97:15-18.)  During her month of termination and

19   30 days thereafter, she claims she earned commissions of about $52,305.50.  (Id. ¶ 66.)

20       After being terminated, Wells Fargo informed her that despite Sawyer's

21   representations, she would not receive her commissions.  (Dkt. No. 32-1, Sako Decl.

22   ¶ 61.)  After she was terminated, she applied for unemployment with the state of

23   California and her claim was initially denied.  (Id. ¶ 62.)  She appealed and after a

24   hearing held on May 28, 2013, the Administrate Law Judge ruled in her favor.  (Id. ¶¶

25   64, 65.)

26   _____

27       [5]Page 30 of the Sawyer deposition transcript is not listed as an uncorrected page.
     (See Dkt. No. 34 at 52.)

28       [6]Pages 97 and 98 of the Sawyer deposition transcript are not listed as uncorrected
     pages.  (See Dkt. No. 34 at 52.)

1   Plaintiff appealed her termination and denial of commissions with Wells Fargo
2   on April 9, 2013.  (Id. ¶ 69.)  On June 27, 2013, she received an email from Nichole
3   Hess denying her appeal.  (Id. ¶ 70.)

4   **A.    Legal Standard for Motion for Summary Judgment**

5   Federal Rule of Civil Procedure 56 empowers the Court to enter summary
6   judgment on factually unsupported claims or defenses, and thereby "secure the just,
7   speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477
8   U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings,
9   depositions, answers to interrogatories, and admissions on file, together with the
10  affidavits, if any, show that there is no genuine issue as to any material fact and that the
11  moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact
12  is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc.,
13  477 U.S. 242, 248 (1986).

14  The moving party bears the initial burden of demonstrating the absence of any
15  genuine issues of material fact.  Celotex Corp., 477 U.S. at 323.  The moving party can
16  satisfy this burden by demonstrating that the nonmoving party failed to make a
17  showing sufficient to establish an element of his or her claim on which that party will
18  bear the burden of proof at trial.  Id. at 322-23.  If the moving party fails to bear the
19  initial burden, summary judgment must be denied and the court need not consider the
20  nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60
21  (1970).

22  Once the moving party has satisfied this burden, the nonmoving party cannot rest
23  on the mere allegations or denials of his pleading, but must "go beyond the pleadings
24  and by her own affidavits, or by the 'depositions, answers to interrogatories, and
25  admissions on file' designate 'specific facts showing that there is a genuine issue for
26  trial.'" Celotex, 477 U.S. at 324.  If the non-moving party fails to make a sufficient
27  showing of an element of its case, the moving party is entitled to judgment as a matter
28  of law. Id. at 325.  "Where the record taken as a whole could not lead a rational trier

[14CV1034-GPC(JMA)]

of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party."  Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact.  Anderson, 477 U.S. at 255.

**B.    Race and Gender Discrimination under FEHA**

The parties do not dispute that Plaintiff asserts a race and gender discrimination under California's Fair Employment and Housing Act ("FEHA").

The Fair Employment and Housing Act ("FEHA") prohibits an employer from terminating an employee based on race or gender.  Cal. Gov't Code § 12940(a).  For cases involving circumstantial evidence, California courts utilize the three-stage burden-shifting framework adopted by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to determine whether there are triable issues of fact for the jury on a claim for gender and race discrimination under FEHA based on the disparate treatment theory.  Trop v. Sony Pictures Entm't, 129 Cal. App. 4th 1133, 1144 (2005) (citing Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354 (2000)).

At trial, Plaintiff must establish a prima facie case by providing evidence that "(1) [she] is a member of a protected class, (2) [she] was qualified for the position she sought or was performing competently in the position [she] held, (3) [she] suffered an adverse employment action . . . , and (4) some other circumstance suggested discriminatory motive."  Guz, 24 Cal. 4th at 355.  An adverse employment decision cannot be made when the gender or race is not known to the employer.  See Avila v. Continental Airlines, Inc., 165 Cal. App. 4th 1237, 1247 (2008).  Plaintiff's initial burden is "not onerous."  Id.  If the employee successfully establishes these elements, a presumption of discrimination arises and the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment

[14CV1034-GPC(JMA)]

1  action.  Id.  This burden is also not onerous and "is generally met by presenting

2  admissible evidence showing the defendant's reason for its employment decision."

3  Wills v. Superior Court, 195 Cal. App. 4th 143, 160 (2011) (citation omitted).

4       If the employer produces evidence showing a legitimate reason for the adverse

5  employment action, the presumption falls away and the burden shifts back to the

6  employee to provide "'substantial responsive evidence' that the employer's proffered

7  reasons were untrue or pretextual." Loggins, 151 Cal. App. 4th at 1109.

8       On a motion for summary judgment by an employer, the McDonnell Douglas

9  framework is modified. "[T]he employer, as the moving party, has the initial burden

10  to present admissible evidence showing either that one or more elements of plaintiff's

11  prima facie case is lacking or that the adverse employment action was based upon

12  legitimate, nondiscriminatory factors." Serri v. Santa Clara Univ., 226 Cal. App. 4th

13  830, 861 (2014). An employer's true reasons, if nondiscriminatory, need not have been

14  wise or correct. Id. The ultimate issue is whether the employer acted with "a *motive*

15  *to discriminate illegally*." Id. (emphasis in original). "If the employer meets its initial

16  burden, the burden shifts to the employee to 'demonstrate a triable issue by producing

17  substantial evidence that the employer's stated reasons were untrue or pretextual, or

18  that the employer acted with a discriminatory animus, such that a reasonable trier of

19  fact could conclude that the employer engaged in intentional discrimination or other

20  unlawful action.'" Id. (citation omitted). "Rather it is incumbent upon the employee

21  to produce 'substantial responsive evidence' demonstrating the existence of a material

22  triable controversy as to pretext or discriminatory animus on the part of the employer."

23  Id. at 862.

24       However, in a case based on direct evidence, the McDonnell Douglas test does

25  not apply. Trop, 129 Cal. App. 4th at 1145. "Where a plaintiff offers direct evidence

26  of discrimination that is believed by the trier of fact, the defendant can avoid liability

27  only by proving the plaintiff would have been subjected to the same employment

28  decision without reference to the unlawful factor." Id.

[14CV1034-GPC(JMA)]

Here, the parties both cite and address the McDonnell Douglas burden-shifting test; therefore, the Court applies the modified framework outlined in McDonnell Douglas.  See Serri, 226 Cal. App. 4th at 861.

### 1.    Legitimate Non-Discriminatory Reason

In its motion for summary judgment, Defendant presents evidence that it had a legitimate, non-discriminatory reason for terminating Plaintiff.  The facts presented demonstrate that Defendant discovered that Plaintiff had drafted six unauthorized pre-approval letters that violated Wells Fargo policy, articulated to the HMCs in November 2011 through *My News*, and reinforced verbally at meetings, and in writing, including an email dated July 10, 2012.  (See Dkt. No. 25-5, Miller Decl. ¶¶ 3, 5, 8, 9-11; Dkt. No. 25-2, Kading Decl., Ex. B, Sawyer Depo. at 48:1-11; 18:24-19:18; 22:10-23:6.) Because she violated company policy by issuing pre-approval letters that were prohibited, and a policy articulated by her supervisor in emails, meetings and in a *MyNews* bulletin, she was terminated.  (Dkt. No. 25-5, Miller Decl. ¶ 15.)  According to Defendant, such a violation was prohibited by Wells Fargo's Code of Ethics and Business Conduct, and Risk Management Accountability policy.  (Id. ¶¶ 9-13.) Defendant has presented facts to show that Wells Fargo had a legitimate, non-discriminatory reason for terminating Sako.  While Busalacchi, Sako's supervisor, reported the unauthorized PBL letter to Human Resources, she was not involved in the decision to terminate Sako.  (Dkt. No. 25-7, Busalacchi Decl. ¶ 3.)

Defendant also contends that Plaintiff has not shown a causal link between her race and gender, and Sako's termination.  See Loggins, 151 Cal. App. 4th at 1109. Plaintiff has failed to show that any of the decision makers that made the decision to terminate Plaintiff knew about her race, or that she made any complaints about gender and race.  (See Dkt. No. 25-3, Kilian Decl. ¶ 19; Dkt. No. 25-5, Miller Decl. ¶ 17; Dkt. No. 25-6, Collins Decl. ¶ 4.)

### 2.    Pretext or Discriminatory Animus

In opposition, Plaintiff summarily argues that Defendant's reason for termination

[14CV1034-GPC(JMA)]

1  are pretextual and motivated by discriminatory intent, and summarily cites to SSUF 1-

2  6, 12-16, 18, 20, 22, 24-28, 30-34, 37-40, 66, and 67.[7] (Dkt. No. 32 at 20.)

3        However, the facts cited by Plaintiff in support of discriminatory intent or pretext

4  do not address any facts concerning race or gender.  Instead, they concern complaints

5  Plaintiff made to her supervisors about "farming" by other HMCs, her increasing

6  amount of stress, and facts surrounding her use of pre-approval letters and the PBLs.

7  (See id.)  In fact, at her deposition, when asked why she was terminated, she testified

8  she was terminated because she was a whistle-blower on issues such as being treated

9  unfairly, and how Wells Fargo was letting others get away with things that were not

10 ethical, that others were getting assistants and making more money while she was

11 drowning in her work "about to have a heart attack", and because she raised an issue

12 that would monetarily affect others.  (Dkt. No. 25-2, Kading Decl., Ex. A at 253:15-

13 254:1; 320:21-321:5.)  These complaints do not relate to her causes of action for

14 gender and race discrimination.

15       In her opposition, and at oral argument, Plaintiff argues that Defendant did not

16 conduct a proper or thorough investigation.  She argues that Kilian only spoke to Sako

17 and did not talk to other HMCs, did not talk to Sako's clients that allegedly received

18 the letters, did not ask Plaintiff's manager if he approved the letters.  She also alleges

19 that Kilian's version of the events is suspect because she did not write down or record

20 the actual conversation, and then shredded her notes.  However, an employer's failure

21 to conduct a complete investigation, without a showing that the reason for the

22

23       [7] In her argument, Plaintiff summarily asserts that she has presented "extensive

24 evidence of . . . the failure to prevent and investigate discrimination."  (Dkt. No. 32 at 20.)  This conclusory statement alleges a cause of action for failure to prevent and

25 investigate discrimination which is a claim not alleged in the complaint.  Accordingly, the Court will not address a cause of action not raised in the complaint.

26       Defendant also argues that Plaintiff asserts a new claim of retaliation in its

27 opposition based on complaints she raised about race and gender discrimination.  The Court agrees.  Based on the Court's ruling granting Defendant's motion for summary

28 judgment on race and gender discrimination, the issue is moot.

termination is false based on conflicting evidence or contrived reasons after the fact, is not sufficient.  See Serri, 226 Cal. App. 4th at 863 (citation omitted) ("The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . . Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [the asserted] non-discriminatory reasons.'") "Logically, disbelief of an Employer's stated reason for a termination gives rise to a compelling inference that the Employer had a different, unstated motivation, but it does not, without more, reasonably give rise to an inference that the motivation was a prohibited one."  Id. (quoting McGrory v. Applied Signal Tech., Inc., 212 Cal. App. 4th 1510, 1531-32 (2013)).   Plaintiff contests the thoroughness of the investigation and has failed to demonstrate "substantial responsive evidence" that the employer's proffered reasons for Sako's termination were untrue or pretextual.  See Serri, 226 Cal. App. 4th at 861.

    The Court notes that the complaint also alleges a claim of hostile work environment due to sexual harassment causing her to take a paycut and demotion.  (Dkt. No. 1-1, Compl. ¶¶ 7, 8, 33, 34).  In her opposition brief, Plaintiff presents facts as to sexual harassment she allegedly endured during her employment with the Wealth Management Division prior to 2006.  She contends she has presented "extensive evidence of a hostile work environment infected with race and gender discrimination . . . ." (Dkt. No. 32 at 20.)  Sako testified that because of the sexual harassment, she requested a transfer from the Wealth Management Division.  (Dkt. No. 25-2, Kading Decl., Ex. A, Maha Depo. at 14:5-17.)  She further stated that her move to Home Mortgage was a demotion because she lost her vacation, her VP title, and all the licenses she used in her work at the private bank.  (Id. at 401:10-14; 402:8-19.)

Despite making these assertions, she fails to assert or provide legal authority that the sexual harassment that occurred at Wealth Management was somehow related or connected to what transpired at the Home Mortgage Division leading to her termination.  In her brief, Sako cites to <u>Spitzer v. The Good Guys, Inc.</u>, 80 Cal. App. 4th 1376 (2000); <u>Nadof-Rahrov v. Neiman Marcus Group, Inc.</u>, 166 Cal. App. 4th 952 (2008); and <u>Nazir v. United Airlines, Inc</u>., 178 Cal. App. 4th 243 (2009) in support.

<u>Spitzer</u> involved a claim of disability discrimination and retaliation under FEHA and the case dealt with whether there was a triable issue of fact whether the employer reasonably accommodated plaintiff's disability.  <u>Spitzer</u>, 80 Cal. App. 4th at 1386.  The court of appeal noted there were inconsistent determinations by the trial court and the court's ruling was not justified by the record.  <u>Id.</u>  This case does not directly support Plaintiff's proposition.

In <u>Nadof-Rahrov</u>, the plaintiff brought an employment discrimination claim based on disability, national origin and ethnicity in violation of FEHA, retaliation in violation of FEHA, and wrongful termination in violation of public policy.  <u>Nadof-Rahrov</u>, 166 Cal. App. 4th at 960.  Plaintiff's theory of discrimination was based on disparate treatment.  In that case, the plaintiff provided deposition testimony that two other non-Middle Eastern employees with disabilities were accommodated but she was not.  <u>Id.</u> at 991.  The court concluded such indirect evidence was sufficient to establish a prima facie case.  <u>Id.</u>  In addition, evidence of the employer's treatment of other Middle Eastern employees, through affidavits by other employees describing discriminatory treatment even though the plaintiff had no personal knowledge of these assertions, was sufficient to demonstrate pretext.  <u>Id.</u> at 992.  While direct evidence was not needed, there was sufficient indirect evidence of discriminatory intent.  <u>Id.</u>  In this case, Plaintiff does not present any evidence of treatment of other similarly situated employees.

In <u>Nazir</u>, the plaintiff alleged causes of action for harassment, discharge and retaliation in violation of FEHA, discharge and retaliation in violation of public policy

and numerous other causes of action. <u>Nazir</u>, 178 Cal. App. 4th at 250. The plaintiff claimed he was the victim of nonstop constant harassment since 1991 until he was terminated in 2005. <u>Id.</u> at 268. When an employer engages in a continuing course of unlawful conduct under FEHA, the statute of limitations begins to run "not necessarily when the employee first believes that his or her rights may have been violated, but rather, *either* when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain." <u>Id.</u> at 270 (quoting <u>Richards v. CH2M Hill, Inc.</u>, 26 Cal. 4th 798, 823 (2001)). Under this doctrine, the plaintiff must demonstrate the unlawful acts are "sufficiently similar in kind"; occurred with reasonable frequency; and the conduct did not acquire a degree of permanence. <u>Richards v. CH2M Hill, Inc.</u>, 26 Cal. 4th 798, 823 (2001). In the context of FEHA, permanence means "that an employer's statement and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile." <u>Id.</u> The tolling period under the continuing violation doctrine ends when the employer achieves a level of permanence. <u>Id.</u>

Here, Plaintiff raises facts concerning the sexual harassment she suffered while working at the Wealth Management Division between 2003 and 2006. (Dkt. No. 32-1, Sako Decl. ¶ 16.) Then between 2010 to the end of 2012, while employed with the Home Mortgage division, Plaintiff asserts she was subject to inappropriate statements and discrimination about her race and gender. (<u>Id.</u> ¶¶ 26, 27 29.) She stated that the Mortgage Division team members did not sexually harass Plaintiff. (Dkt. No. 33-1, Kading Decl., Ex. A , Sako Depo. at 16:12-16.) In analyzing the factors for a continuing violation, the sexual advances and harassment she suffered at WFMB is not sufficiently similar in kind to the gender harassment she alleged she was subject to at the Home Mortgage division. Further, Plaintiff does not provide facts as to the frequency of these allegedly unlawful acts and does not provide facts concerning

1   whether the conduct acquired permanence.  See Richards, 26 Cal. 4th at 823.

2          In addition, in Nazir, the court noted that "pretext may . . . be inferred from the

3   timing of the company's termination decision, by the identify of the person making the

4   decision, and by the terminated employee's job performance before termination."

5   Nazir, 178 Cal. App. 4th at 271-72.  Here, the alleged sexual harassment between 2003

6   to 2006 is significantly removed in time from Sako's termination on March 20, 2013.

7   The people in charge of the termination decision did not know about any complaints

8   Sako made, which include complaints of sexual harassment.  It is disputed whether

9   Sako's job performance before termination was the "real" reason for her termination.

10  In sum, these factors do not support an inference of pretext for Plaintiff's termination.

11         Thus, Plaintiff has not satisfied her burden of rebutting Defendant's legitimate

12  reason for her termination.  Accordingly, the Court GRANTS Defendant's motion for

13  summary judgment on the race and gender discrimination pursuant to FEHA.

14  **C.     Wrongful Termination in Violation of Public Policy**

15         **1.     Public Policy - Complaints about Gender and Race Discrimination**

16         Defendant contends that Plaintiff cannot prove that her termination violated

17  public policy because her discharge did not thwart any statutory or constitutional

18  policy.  Plaintiff responds she complained about race and gender discrimination which

19  implicate FEHA, a statutory provision.  Defendant does not address this assertion.

20         California law recognizes a claim for wrongful termination in violation of a

21  public policy reflected in a statute or constitutional provision.  Tameny v. Atlantic

22  Richfield Co., 27 Cal. 3d 167, 172 (1980).  Employees may recover tort damages if

23  they can show they were terminated in retaliation for engaging in an activity protected

24  by a fundamental public policy.  Green v. Ralee Eng'g Co., 19 Cal. 4th 66, 71 (1998).

25  "To support a wrongful discharge claim, the policy must be (1) delineated in either

26  constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the

27  benefit of the public' rather than serving merely the interests of the individual; (3) well

28  established at the time of the discharge; and (4) substantial and fundamental."  Phillips

[14CV1034-GPC(JMA)]

1  v. St. Mary Regional Med. Ctr., 96 Cal. App. 4th 218, 226 (2002) (citations omitted).

2  In a claim for wrongful termination in violation of public policy, California

3  utilizes the three-stage burden-shifting framework adopted by the United States

4  Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Loggins,

5  151 Cal. App. 4th at 1108-09.   Since Defendant moves on summary judgment, the

6  McDonnell Douglas burden-shifting standard is modified. See Serri, 226 Cal. App. 4th

7  at 861.

8  FEHA's broad goal is to forward "the public policy of the state that it is

9  necessary to protect and safeguard the right and opportunity of all persons to seek,

10  obtain, and hold employment without discrimination or abridgement on account of

11  race, religious creed, color, . . . sex or age." Rojo v. Kliger, 52 Cal. 3d 65, 72-73

12  (1990) (quoting Cal. Gov't Code § 12920). It is to be "construed liberally." Robinson

13  v. FEHC, 2 Cal. 4th 226, 233   (1992) (quoting Cal. Gov't Code § 12993(a)).

14  California courts have held that FEHA claims of race, age, disability or retaliation can

15  support a claim for wrongful termination in violation of public policy. See Ross v. San

16  Francisco Bay Area Rapid Transit Dist., 146 Cal. App. 4th 1507, 1515 (2007); Phillips

17  v. St. Mary Regional Med. Ctr., 96 Cal. App. 4th at 227 (concerning race, sex and

18  retaliation, "FEHA's provisions prohibiting discrimination may provide the policy

19  basis for a claim for wrongful discharge in violation of public policy."); Stevenson v.

20  Superior Court, 16 Cal.4th 880, 890 (1997) (age discrimination by employers in

21  violation of FEHA can form basis of wrongful discharge claim); City of Moorpark v.

22  Superior Court, 18 Cal. 4th 1143, 1161 (1998) (disability).

23  Here, Plaintiff alleges she was engaged in protected activity when she

24  complained about her race and gender discrimination, and has sufficiently alleged a

25  public policy to support a wrongful termination claim.  However, because Plaintiff's

26  wrongful termination claim is based on the same facts as her FEHA race and gender

27  discrimination claim, the Court also GRANTS Defendant's motion for summary

28  judgment on the public policy claim as to race and gender discrimination.   See

1   Lawrence v. Turner's Outdoorman Corp., 465 Fed. App'x 657, 659 n.2 (9th Cir. 2012)

2   (unpublished) (reversing district court's grant of summary judgment in favor of

3   defendant as to race discrimination; therefore, since the wrongful termination is based

4   on the same facts as his FEHA race discrimination, that claim must be reversed too).

5           **2.     Public Policy - Complaints about Violations of "Farming" Policy**

6           Defendant contends that Plaintiff cannot show that her termination was in

7   violation of public policy because her complaints that team members were violating

8   Wells Fargo policy of soliciting existing Wells Fargo customers not in their own "book

9   of business" violated Wells Fargo's internal policy and not any statutory or

10  constitutional policy.[8]  Plaintiff opposes arguing that she engaged in protected activity

11  by complaining about company policy and possibly the law.

12          In a claim for wrongful termination, Plaintiff must show that she was engaged

13  in an activity protected by a fundamental public policy.  A fundamental policy is

14  beneficial to the public and embodied in a statute or constitutional provision.  Turner

15  v. Anheuser–Busch, Inc., 7 Cal. 4th 1238, 1256 (1994).  While reporting an "illegal,

16  unethical, or unsafe practices" in the workplace is protected by a fundamental public

17  policy, Collier v. Superior Court, 228 Cal. App. 3d 1117, 1122 (1991), such practices

18  must harm the public as well as the employer.  Id. at 1119-1120.  In Collier the plaintiff

19  was terminated shortly after he reported his suspicions to management that other

20  employees were illegally shipping large quantities of free, promotional recordings to

21  certain retailers for unauthorized sale to the public.  Id.  The court of appeal concluded

22  that the fundamental public policy of deterring crime and encouraging employees to

23  report suspected illegal activity in the workplace protected the plaintiff's reports to the

24  record company.  Id. at 1123.  The court noted that the law potentially violated was

25  bribery and kickbacks, embezzlement, tax evasion, antitrust activity and possibly drug

26  _____

27          [8]Defendant argues that Plaintiff's complaints that she needed her own assistant
    do not implicate a fundamental public policy.  In opposition, Plaintiff does not dispute
28  or address her complaints about requesting an assistant, and the Court considers the
    issue waived.

trafficking and money laundering. Id. at 1122-23. The employee's conduct benefitted the public by advancing its interest in prosecuting crime in the workplace but also by protecting potential victims harmed by the illegal activity. Id. at 1124-25.

The policy allegedly violated by the termination of employment must be one that "inures to the benefit of the public at large rather than to a particular employer or employee." Foley v. Interactive Data Corp., 47 Cal. 3d 654, 669 (1988); see Stevenson, 16 Cal. 4th at 894, 901-02. Policies are not "public" when they "simply regulate conduct between private individuals, or impose requirements whose fulfillment does not implicate fundamental public policy concerns." Foley, 47 Cal. 3d at 669. In Foley, because the employee's report to the employer that the FBI was investigating a coworker for embezzlement only served the private interest of the employer, the employee's claim for tortuous discharge in violation of public policy was not actionable. Id. at 671.

As to Plaintiff's complaints concerning violations of the "farming" rules that she alleges is illegal, Plaintiff cites solely to an email by Drew Collins concerning "farming," where he referenced, "[t]hese policies are designed to protect the respective Books of Business (BoB) and ensure a positive customer experience." (Dkt. No. 32-2, Gomez Decl., Ex. 5 at 143-44.) He also states, "Branches may also be fined up to $10,000 and will bear additional Legal or other costs associated with non-compliance." (Id. at 144.) While Plaintiff argues there are possible legal implications based on the email's use of "Legal or other costs", Plaintiff does not identify a specific statute, constitutional provision, or crime concerning "farming." The conduct she complained about is a breach of company policy rather than any legal statute or regulation, or other violation based in law. In fact, Plaintiff testified that it was a violation of Wells Fargo policy and unethical sales behavior for HMCs to solicit existing Wells Fargo customers not in their own book of business. (Dkt. No. 25-2, Kading Decl., Ex. A, Sako Depo. at 357:11-358:24.)

At oral argument, Plaintiff, for the first time, argued that her complaints about

[14CV1034-GPC(JMA)]

the farming policy involve a violation of privacy rights and that she could have potentially complained to the Labor Department.   However, Plaintiff point to no evidence in the record that Plaintiff was planning to or intended to file a complaint with a government agency, and no evidence that the people involved with her termination knew about such potential acts by Sako.

Plaintiff's citations to <u>Lujan v. Minagar</u>, 124 Cal. App. 4th 1040 (2005), and <u>Diego v. Pilgrim United Church of Christ</u>, 231 Cal. App. 4th 913 (2014) are not persuasive. In both cases, there was a fundamental public policy embodied in a statute. <u>See</u> <u>Lujan</u>, 124 Cal. App. 4th 1045 n. 4 (section 6310 of Cal. Labor Code (which protects employees against preemptive retaliation by an employer that believes an employee might file a workplace safety complaint) supported claim for wrongful termination); <u>Diego</u>, 231 Cal. App. 4th at 921 (section 1102.5(b) of Labor Code established the Legislature's declaration of a public policy sufficient to allow plaintiff's claim to proceed on wrongful termination).

The Court concludes that Plaintiff's allegation that she was engaged in protected activity when she complained about the "farming" policy is without merit. Accordingly, because Plaintiff has not demonstrated that complaints concerning violations of Wells Fargo's "farming" rules constitute a fundamental public policy, her claim for wrongful termination fails.  Thus, the Court GRANTS Defendant's motion for summary judgment for wrongful termination concerning her complaints about violations of Wells Fargo's "farming" policy by other HMCs.

**D.    Intentional Infliction of Emotional Distress**

In the Complaint, Plaintiff asserts an intentional infliction of emotional distress ("IIED") claim based on the facts underlying the claims of wrongful termination, and race and gender discrimination under FEHA.  (Dkt. No. 101, Compl. ¶¶ 39-42.)

The tort of intentional infliction of emotional distress is comprised of three elements: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the

[14CV1034-GPC(JMA)]

plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct. Cochran v. Cochran, 65 Cal. App. 4th 488, 494 (1998).  The California Supreme Court has set a "high bar" to demonstrate severe emotional distress.  Hughes v. Pair, 46 Cal. 4th 1035, 1051 (2009) "Severe emotional distress means 'emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'" Id. (citation omitted).  Suffering discomfort, worry, anxiety, an upset stomach, concern and agitation due to comments made on the telephone do not constitute emotional distress.  Id.

If a plaintiff's IIED claim is based on allegations of discrimination and wrongful termination, the plaintiff's failure to provide evidence supporting those underlying allegations will usually foreclose an IIED claim. See Hawkins v. SimplexGrinnell L.P., Civil No. 12cv1406 L(BGS), 2014 WL 769345, at *11 (S.D. Cal. Feb. 25, 2014) (citing Lee v. Eden Med. Ctr., 690 F. Supp. 2d 1011, 1022 (N.D. Cal. 2010) (awarding summary judgment to the defendant on plaintiff's IIED claims because the plaintiff failed to provide sufficient evidence to support FEHA claims of harassment, discrimination, and retaliation arising from the same non-outrageous conduct)); Gutierrez v. Kaiser Fdn. Hosps., Inc., No. C 11-3428 CW, 2012 WL 5372607, at *10 (N.D. Cal. Oct. 30, 2012) (when a plaintiff bases an IIED claim on allegations of discrimination and harassment, the plaintiff's failure to provide evidence supporting these claims will usually doom the IIED claim).

Because the Court conclude Plaintiff failed to demonstrate a genuine issue of fact as to Plaintiff's claims of race and gender discrimination, and wrongful termination, and the IIED claim is based on the same underlying facts, the Court GRANTS summary judgment on this claim.

**E.    Unpaid Wages and Waiting Time Penalties**

Plaintiff alleges that she was owed commissions, pursuant to California Labor Code sections 200(a), 201 and 203 on loans that funded in the month of her discharge,

March 2013, and 30 days thereafter.  She also asserts that the Wells Fargo Code of Ethics and Business Conduct and the 2013 Incentive Compensation Plan ("Plan") for HMCs that Defendant relied on to deny her commissions are unconscionable and unenforceable.

Defendant argues that Plaintiff is not entitled to the commissions because the Plan provides disqualification of commissions if termination is due to violation of Wells Fargo's Code of Ethics and Business Conduct, and Risk Management Accountability policy.  According to the Plan, an employee is disqualified for commissions which fund in the month of termination if an employee is terminated for violation of Wells Fargo's policies.

To be eligible for incentive compensation under the Plan, the employee must adhere to the Wells Fargo's Code of Ethics and Business Conduct and Wells Fargo's employment policies.  (Dkt. No. 25-5, Miller Decl., Ex. M. at 158.)  The 2013 Plan addresses eligibility for incentive compensation.

> To be eligible for incentive compensation, you must satisfy minimum standards and requirements as set forth in the Plan.  Additionally, you must adhere to *Wells Fargo's Code of Ethics and Business Conduct,* Wells Fargo's employment policies, and the compliance and risk management accountability requirements for your position, including, but not limited to, compliance with all policies, laws, rules, and regulations applicable to WFHM business activities as a condition precedent to earning compensation under the Plan.  Failure to meet these minimum standards and requirements will disqualify you from earning incentive compensation under the Plan . . . and may result in corrective action, including, but not limited to, immediate termination of employment. . . .
>
> A Participant's incentive opportunity under the Plan may be adjusted or denied, regardless of meeting performance measures, for unsatisfactory performance or non-compliance with or violation of Wells Fargo's
>
> 1.   Code of Ethics and Business Conduct;
> 2.   Information Security Policy, and/or
> 3.   Rick Management Accountability Policy.

(Id.)

The Plan further states, "[m]isconduct may disqualify Employee from earning compensation under the Plan.  If disqualified, no monthly commission credit shall be

awarded for loans which fund in the month of termination." (Dkt. No. 25-2, Miller Decl., Ex. M at 167.) Misconduct means, "Employee's receipt of notice of termination by Employer arising from . . . 2) Employee's violation of Employer's policies including, but not limited to, Wells Fargo's Code of Ethics and Business Conduct, Information Security Policy or Compliance and Risk Management Accountability Policy . . . ." Id. at 168. The next paragraph states, "[e]vents such as those described above may trigger a termination for violation of policy. Team members terminated for violation of policy will not be eligible for unpaid incentives." (Id. at 168.)

A salesperson's right to a commission depends on the terms of the contract for compensation. Nein v. HostPro, Inc., 174 Cal. App. 4th 833, 853 (2009). However, terms of a contract may be unenforceable if deemed to be unconscionable. See Cal. Civil Code § 1670.5(a) ("If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.").

Unconscionability has a procedural and a substantive element. American Software Inc. v. Ali, 46 Cal. App. 4th 1386, 1390 (1996). The procedural component focuses on oppression, unequal bargaining power, and surprise. Stirlen v. Supercuts, Inc., 51 Cal. App. 4th 1519, 1532 (1997). The substantive element "has to do with the effects of the contractual terms and whether they are unreasonable." Marin Storage & Trucking, Inc. v. Benco Contracting and Eng'g, Inc., 89 Cal. App. 4th 1042, 1053 (2001). Whether a contract is unconscionable must be evaluated at the time the contract was made. Stirlen, 51 Cal. App. 4th at 1532. " Some courts have indicated that a sliding scale applies for example, a contract with extraordinarily oppressive substantive terms will require less in the way of procedural unconscionability" Amercan Software, Inc., 46 Cal. App. 4th at 1391. "To be unenforceable, a contract must be both procedurally and substantively unconscionable." Stirlen, 51 Cal. App.

4th at 1532.

### 1.    Procedural Unconscionability

Plaintiff argues that Wells Fargo's Code of Ethics and other policies were prepared solely by Well Fargo without any input by Sako or any HMC.  The Plan can change year to year at the discretion of Wells Fargo, it is not negotiated by HMCs but is presented as a take it or leave it document, and employees have no power to alter those terms.

Defendant reply asserting that Plaintiff has not presented any evidence that Wells Fargo prepared the plan "without the input" of any HMCs or that Team Members are not allowed to negotiate its terms.  Moreover, Plaintiff has presented no evidence that she ever attempted to negotiate the terms of the Plan.

Procedural unconscionability concerns unequal bargaining power, absence of real negotiations, and surprise, resulting from hiding disputed terms in a prolix document.  American Software, Inc., 46 Cal. App. 4th at 1391.  When an employee is required to execute an [ ] agreement as a prerequisite of employment without an opportunity to negotiate, the agreement will be deemed adhesive and procedurally unconscionable.  Armendariz v. Fdn. Health Psychcare Servs., Inc., 24 Cal. 4th 83, 115-16 (2000); Szetela v. Discover Bank, 97 Cal. App. 4th 1094, 1100 (2002) (when weaker party is told to take it or leave it without a meaningful opportunity to negotiate, procedural unconscionability is present.); Aral v. EarthLink, Inc., 134 Cal. App. 4th 544, 557 (2005) (no opportunity to opt out "is quintessential procedural unconscionability").  "Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion."  Armendariz, 24 Cal. 4th at 113.  "The term [contract of adhesion] signifies a [1] standardized contract, which, [2] imposed and drafted by the party of superior bargaining strength, [3] relegates to the subscribing party only the opportunity to adhere to the contract or reject it."  Id.; see also Bruni v. Didion, 160 Cal. App. 4th 1272, 1291 (2008).  "It is well settled that adhesion contracts in the employment context, that is, contracts offered to employees on a take-it-or-leave-it

basis, typically contain some aspects of procedural unconscionability." Serpa v. California Surety Investigations, Inc., 215 Cal. App. 4th 695, 704 (2013).

Nichole Hess, an employee of Wells Fargo who reviewed Plaintiff's appeal, testified that the Plan was prepared by Wells Fargo . (Dkt. No. 32-3, Gomez Decl., Ex. 10, Hess Depo. at 40:18-20.) Sako testified that the Plan is a "take it or leave it" Plan so HMCs cannot negotiate or alter the terms of the Plan. (Dkt. No. 32-1, Sako Decl. ¶ 60.) She testified that while she does not recall receiving a copy of the 2013 Plan, she was aware of the terms of the Plan and how HMCs were to be paid. (Dkt. No. 25-2, Kading Decl., Ex. A, Sako Depo. at 323:11-25.) Plaintiff signed an acknowledgment on January 25, 2000 stating she received the Handbook for Wells Fargo Team Members, and had read and would adhere to the Code of Ethics and Business Conduct. (Dkt. No. 33-2, Suppl. Kading Decl., Ex. 4 at 77.)

Wells Fargo is the party with the superior bargaining power since it drafted the contract. See A&M Produce Co. v. FMC Corp., 135 Cal. App. 3d 473, 486 (1982) ("Characteristically, the form contract is drafted by the party with the superior bargaining position.") Second, the 2013 Plan and the Code of Ethics and Business Conduct are pre-printed standardized forms. Third, Plaintiff alleges that the terms of the Plan and Code of Ethics were on a take it or leave it basis. Thus, Plaintiff has provided evidence that the Code of Ethics and the Plan are contracts of adhesion.

In response, Defendant does not provide any facts to dispute Plaintiff's assertions that the HMCs were not allowed to negotiate the provisions of the Plan or that they were involved in drafting the Plan. Wells Fargo merely argues the sufficiency of Plaintiff's facts asserting that Plaintiff has failed to demonstrate that she attempted to negotiate her Plan or that HMCs were not involved in drafting the Plan. However, on summary judgment, the opposing party must present specific facts to demonstrate there is genuine issue of material fact. Celotex, 477 U.S. at 324. Defendant has failed to present any facts that the Code of Ethics and the Plan are not contracts of adhesion. Therefore, the Court concludes that the provisions in the Code of Ethics and the Plan

concerning disqualification of commissions are procedurally unconscionable.

### 2.    Substantive Unconscionability

Plaintiff also argues that the vague provisions in the Code of Ethics and the Plan make them substantively unconscionable. They give Wells Fargo unfettered discretion to enforce subjective and vague conduct with no definition to define key words such as "exercise good judgment and common sense." Defendant maintains that the Code of Ethics and Plan are not vague and provide Plaintiff notice as to specific conduct, such as "falsification" of information, that would cause disqualification of commissions.

Substantive unconscionability looks to the "one-sided" or "overly harsh" results of a contract. Stirlen, 51 Cal. App. 4th at 1532. A "contract is largely an allocation of risks between the parties, and therefore that (sic) a contractual term is substantively suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner." Stirlen, 51 Cal. App. 4th at 1532. A lack of mutuality can support a finding of substantive unconscionability. Nagrampa v. MailCoups, Inc., 469 F.3d 1257, 1285-86 (2006); Soltani v. Western & Southern Life Ins. Co., 258 F.3d 1038, 1043 (9th Cir. 2001). The Court looks at whether the contract terms are so unreasonable, unjustified, or one-sided as to "shock the conscience." Stirlin, 51 Cal. App. 4th at 1055.

In American Software, the plaintiff entered into an employment agreement which provided that sales commissions were paid at the time payment was received from the buyer, and in the event of voluntary separation from the company, the employee agreed to forfeit any commissions not due within 30 days after the termination. 46 Cal. App. 4th at 1389. The court held the provision was not unconscionable because the contract was the result of arms's length negotiation between two sophisticated and experienced parties of comparable bargaining power, the plaintiff had her buddy, an attorney, review the contract, the contract fairly reflected prevailing practices in employing commissioned sales, and the allocation of risk was mutual. Id. at 1393-95.

[14CV1034-GPC(JMA)]

The court explained that in evaluating substantive unconscionability, the contract terms are to be evaluated "in the light of the general commercial background and the commercial needs of the particular trade or case . . . ." Id. at 1392 (quoting Cal. U.C.C. § 2-302, comment 1); see also Cal. Civil Code § 1670.5 ("[w]hen it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination.") In American Software, the court concluded that the challenged contract provision was commonplace in employment contracts with sales representatives who have continuing responsibilities to "service" the account once the sale is made. Id. at 1393.

Here, the 2013 Plan states, "[t]he terms and conditions of the Plan are subject to periodic review and may be adjusted by WFHM. . . . The Plan is subject to change at any time at the Employer's sole discretion." (Dkt. No. 25-5, Miller Decl., Ex. M at 158.) In another provision, it states "[t]he Plan Administrator . . . may amend, suspend or terminate the Plan at any time for any reason, with or without notice." (Id. at 166.) Furthermore, "[p]articipation in this Plan does not constitute a guarantee or contract of employment with WFHM, or participating employer. . . . Therefore, each Employee shall remain an employee-at-will at all times during the duration of employment with Employer." (Id. at 166.) An employee will be disqualified from earning compensation under the Plan if engaged in misconduct which includes a violation of the Code of Ethics and Business Conduct. (Id. at 168.)

Wells Fargo's Code of Ethics and Business Conduct generally provides that team members should "act in a manner that will serve the best interests of Wells Fargo, that is honest and trustworthy, that will preserve confidential information, and that will avoid conflicts of interest or the appearance of conflicts of interest." (Dkt. No. 25-2, Miller Decl., Ex. C at 64.) In the section heading, Act with Honesty, Integrity & Trustworthiness, it provides,

> To preserve and foster the public's trust and confidence, complete honesty and fairness is required in conducting internal and external

> business.  It's important that every Wells Fargo team member understands that the honesty, trust, and integrity essential for meeting the highest standards of corporate governance are not just the responsibility of senior management, or boards of directors.  We all share that responsibility.  Corporate ethics is the sum total of the ethical decisions that all of us make every day.

(Id.)  In the section heading, Company Information, it states, "Honesty and fairness require that team members provide accurate and complete information in dealing with customers and others."  (Id. at 67.)  Under another section, "Accurate Records," the Code of Ethics provides that employees are responsible "for preparing and maintaining accurate records to the best of your knowledge . . . ."  (Id. at 68.)  "Falsification of any company or personal information that you provide is prohibited.  Falsification refers to knowingly misstating, altering, adding information to, or omitting or deleting information from a Wells Fargo record or system which results in something that is untrue, fraudulent, or misleading."  (Id.)  The Code of Ethics further states, "**If you violate any provision of the Code . . . you will be subject to corrective action, which may include termination of your employment.**"  (Id. at 103, 63, 64) (emphasis in original).

According to Defendant, Plaintiff was terminated for the following: Plaintiff did not comply with Wells Fargo's policies and procedures, did not act in an honest, ethical, and legal manner, did not act to protect Wells Fargo's reputation, did not provide accurate information to customers, made false statements to customers, acted outside her authority and created risk for Wells Fargo. (Dkt. No. 25-5, Miller Decl. ¶ 13; Dkt. No. 25-2, Miller Decl., Ex. L at 155.)  These acts were in violation of the Wells Fargo's Code of Ethics and Business Conduct, and Risk Management Accountability policy.[9]  (Id.)

While the parties present the terms of the Plan and the Code of Ethics, they do

---

[9]The parties do not specifically address the Risk Management Accountability policy for purposes of addressing unconscionability.  The policy merely states that as a Wells Fargo team member, she is fully accountable for knowing all Wells Fargo's policies, procedures, standards, guidelines and complying with the laws, regulations and policies that apply to her job.  (Dkt. No. 25-5, Miller Decl., Ex. E at 120.)

not provide any explanation as to how the compensation under the Plan is earned. While the Plan is attached as an exhibit to Defendant's motion (Dkt. No. 25-5, Miller Decl., Ex. M), neither party cites to the specific provisions concerning calculation of the commission, and the parties provide no explanation on how and when commissions are earned.[10]  Moreover, the parties have not provided any significant case analysis or facts to aid the Court in determining whether the commission provisions in the Plan are common in the industry.  See American Software, 46 Cal. App. 4th at 139.  Therefore, there is an issue of fact as to whether the Plan and the Code of Ethics contain provisions that are substantively unconscionable.  Accordingly, the Court DENIES Defendant's motion for summary judgment on the claims under California Labor Code sections 200(a), 201 and 203.

## F.      Unfair Business Practices

Plaintiff alleges that Defendant's actions constitute unfair business practices in violation of California Business & Profession Code sections 17200 *et seq*.  (Dkt. No. 1-1, Compl. ¶¶ 60-64.)  She alleges unfair business practices based on violations of the Labor Code for failure to pay wages and failure to timely pay.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  "Each of these three adjectives captures a separate and distinct theory of liability."  Rubio v. Capital One Bank, 613 F.3d 1195, 1203 (9th Cir. 2010).  Section 17200 "borrows" violations of other laws and treats them as unlawful practices independently actionable under section 17200.  Id.  "Unfair" means any practice whose harm to the victim outweighs its benefits.  Olsen v. Breeze, Inc., 48 Cal. App. 4th 608, 618 (1996).

Because the Court DENIES Defendant's motion for summary judgment on the Labor Code violations claims, the Court DENIES Defendant's motion for summary judgment on the UCL claim based on the same underlying facts.

## G.      Punitive Damages

---

[10]The Court's review of the Plan reveals that it is complex and technical.

1    Plaintiff seeks punitive damages arguing that Defendant acted with fraud,
2  oppression or malice when Plaintiff reported discriminatory and unlawful conduct but
3  told her to toughen up and endure it.  These allegations are based on the gender and
4  race discrimination and wrongful termination claims.  Because the Court GRANTS
5  summary judgment in favor of Defendant on the wrongful termination and FEHA
6  causes of action, the Court GRANTS Defendant's motion for summary judgment on
7  Plaintiff's request for punitive damages.  <u>See</u> <u>Munson v. Splice Commc'ns, Inc.</u>, Case
8  No. 12cv5089-JCS, 2013 WL 6659454, at *24 (N.D. Cal. Dec. 16, 2013) (granting
9  summary judgment on request for punitive damages because court granted defendants'
10  motion for summary judgment on the underlying related claims).

11  **H.  Request for Judicial Notice**

12    Plaintiff filed a request for judicial notice of two documents.  (Dkt. No. 32-7.)
13  One document is an order on the parties' joint motion for the legal determination of a
14  stipulated issue dated August 25, 2014 in <u>Wells Fargo Nat'l Bank Nat'l Ass'n v. Cesar</u>
15  <u>Ascarrunz</u>, Case No. CGC-13-535636. in the San Francisco County Superior Court,
16  and a Decision of the California Unemployment Insurance Appeals Board, Case No.
17  4841677, <u>In the Matter of Maha A. Sako/Appellant v. Wells Fargo/Employer</u>.
18  Defendant filed an opposition to the request for judicial notice. (Dkt. No. 33-4.) Since
19  the Court did not consider the documents in ruling on the motion for summary
20  judgment, the Court DENIES Plaintiff's request for judicial notice as moot.

21  **I.  Evidentiary Objections**

22    Defendant filed evidentiary objections to evidence filed in Plaintiff's opposition
23  to Defendant's motion for summary judgment.  (Dkt. No. 34.)  The Court notes the
24  objections.  To the extent that the evidence is proper under the Federal Rules of
25  Evidence, the Court considered the evidence.  To the extent that the evidence is not
26  proper, the Court did not consider it.

27                                **Conclusion**

28    Based on the ruling above, the Court GRANTS in part and DENIES in part

Defendant's motion for summary judgment.  Specifically, the Court GRANTS Defendant's motion for summary judgment on the claims for wrongful termination, gender and sex discrimination under FEHA, and intentional infliction of emotional distress.  The Court also GRANTS Defendant's motion for summary judgment on Plaintiff's request for punitive damages.

The Court DENIES Defendant's motion for summary judgment on the causes of action for unpaid wages pursuant to California Labor Code section 200(a), waiting time penalties pursuant to California Labor Code sections 201, and California Business & Professions Code section 17200 *et seq.*

IT IS SO ORDERED.

DATED:  August 21, 2015

HON. GONZALO P. CURIEL
United States District Judge